RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0052p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

EDWARD THOMAS KENDRICK, III,

*Petitioner-Appellant*,

*v.*

MIKE PARRIS, Warden,

*Respondent-Appellee*.

No. 19-6226

─────────────────

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 1:16-cv-00350—J. Ronnie Greer, District Judge.

Argued: January 26, 2021

Decided and Filed: March 2, 2021

Before: GUY, LARSEN, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Amanda Rauh-Bieri, MILLER, CANFIELD, PADDOCK, AND STONE, PLC, Grand Rapids, Michigan, for Appellant. John H. Bledsoe, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Amanda Rauh-Bieri, Paul D. Hudson, MILLER, CANFIELD, PADDOCK, AND STONE, PLC, Grand Rapids, Michigan, for Appellant. John H. Bledsoe, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. Joshua Counts Cumby, ADAMS AND REESE LLP, Nashville, Tennessee, for Amici Curiae.

─────────────────

## OPINION

─────────────────

LARSEN, Circuit Judge. One evening in 1994, Edward Kendrick III fatally shot his wife outside a Chattanooga gas station. At trial, he insisted that his rifle had malfunctioned and fired

without Kendrick pulling the trigger.  But the jury didn't buy his account.  Instead, it convicted Kendrick of first-degree murder.

In his petition for state postconviction relief, Kendrick raised seventy-seven claims alleging either ineffective assistance of counsel (IAC) or prosecutorial misconduct.  He succeeded in the Court of Criminal Appeals on two of his IAC claims, but the Tennessee Supreme Court reversed as to both.  In doing so, it held that counsel's decision not to adduce the testimony of a firearms expert was not constitutionally deficient performance.  Neither was counsel's failure to introduce favorable hearsay statements under the excited utterance exception.

Kendrick then sought federal habeas review.  The district court denied his forty-eight-claim petition.  We granted a certificate of appealability (COA) on the two IAC claims that the Tennessee Court of Criminal Appeals had initially found meritorious.  Because the Tennessee Supreme Court did not unreasonably apply Supreme Court precedent in denying Kendrick relief, we now AFFIRM.

I.

Kendrick was holding his Remington Model 7400 hunting rifle at the time it fired a single bullet at point-blank range into his wife's chest.  That much has never been disputed.  Kendrick's intent, on the other hand, always has been.  The State contended this was a cold-blooded execution.  Kendrick insisted it was a freak accident.

A.

In the early months of 1994, Kendrick and his wife Lisa were in the process of pursuing what Kendrick described as an "amicable" divorce based on irreconcilable differences.  They were still living together, along with their three-year-old son and four-year-old daughter.  Lisa was working at a gas station in Chattanooga, Tennessee.

Lisa was on duty on the evening of March 6, 1994, and had been talking with her friend, Lennell Shepheard Jr., for over an hour.  Just before 10:00 p.m., she received a page from her husband and returned his call.  A little while later, Kendrick pulled into the parking lot with their two children sitting in the backseat of his car.  Kendrick entered the gas station and told Lisa,

"when she got a chance, to step outside, that he wanted to talk to her." Kendrick walked out first, and Lisa followed after she finished ringing up a customer. From where Shepheard was standing inside the station, "it looked like . . . they were arguing" outside, but Shepheard couldn't hear anything or see clearly what was going on.

"After that [Shepheard] heard a boom." He did not know what it was at first, but upon opening the door, he saw Lisa lying on the ground with Kendrick "standing over her." The sound had been a gunshot, which two other witnesses heard as well. Charles Mowrer, who lived across the street, testified that he ran outside following the "extremely loud shot" and saw "a lady laying [sic] on the ground with a man looking over her." Timothy Benton, who was just pulling out of the gas station, "heard an explosion" too. Benton looked back and saw Kendrick holding a gun "pointed straight up in the air." "The right hand was on the pistol grip area around the trigger and the left hand was up near the stock."

Shepheard testified that Kendrick then stood over Lisa's body, while repeating "I told you so, I told you so," about six times. During trial, Kendrick denied making these statements. And Kendrick's counsel pointed out that the records from Shepheard's initial interview with police did not mention Kendrick saying "I told you so" at all. Nevertheless, it is undisputed that Kendrick did not "render any assistance" to Lisa or "call out for help" after shooting her. He made eye contact with Shepheard, fumbled for the passenger door "at least three times," and then "ran around the car, jumped in and left." During his flight, Kendrick threw the gun out of his vehicle onto the side of the road.

Meanwhile, Timothy Benton had turned his car around and had pulled back into the gas station to help. But when he saw Lisa lying on the ground and Shepheard about to call 911, he gave chase to Kendrick instead—"to make sure he didn't get away." Within minutes, Benton caught up with Kendrick and "followed him into the Chattanooga Airport."

At the airport, now about five minutes after the shooting, Kendrick dialed 911 himself. He immediately stated: "I want to turn myself in. . . . My wife, I just shot my wife." Kendrick then revealed to the operator that he was at the airport and would wait with his kids for the police to arrive. After Kendrick was placed into a police vehicle and advised of his rights, he said "I

hope this is only a dream." He made no suggestion to the officers that the shooting had been an accident.

An officer then spoke with Kendrick's four-year-old daughter, Endia, who "was very upset, was crying, [and] seemed to be very scared." At trial, a second officer also claimed that Endia was "hysterical" and "stated that she had told daddy not to shoot mommy but he did and she fell." Endia, for her part, testified that she "saw [Kendrick] shoot" her mother and that Lisa "was standing with her hands up" at the time. The positioning of Lisa's hands was supported by forensic evidence of stipple injuries on her forearms. Yet on cross-examination, Endia admitted that she "remember[ed] telling [Kendrick's counsel] that [she] didn't see [her] daddy shoot [her] mommy." And she agreed that Kendrick got the gun out of the front seat of the car "because [her] mommy wanted him to put the gun in the back of the car." Counsel also insinuated that Lisa's parents—with whom Endia was living at the time of trial—were attempting to manipulate Endia's story.

Later that evening, Officer Steve Miller of the Chattanooga Police Department retrieved Kendrick's gun, a Remington Model 7400, from the side of the road. He placed the rifle in his car to take back to the station. But around 1:45 a.m., as Miller "was gathering the evidence" out of the trunk of his car, he pointed the gun downward and "the weapon discharged," firing a bullet into his left foot. According to police incident reports, Miller told other officers that the gun had fired without Miller having touched the trigger; but Miller claimed not to remember the "exact position of [his] hand" when asked on the stand.

Kendrick's counsel challenged this lack-of-memory testimony with a vigorous cross-examination. Miller admitted that he had been a police officer for twenty-two years, that he had never accidentally discharged a firearm, and that it is "drilled into you at the police academy don't ever put your hand on the trigger unless you're going to shoot the gun." He also confirmed that he would "[n]ever" otherwise "knowingly" place his finger on the trigger of a loaded gun. And Miller conceded that he "presumed [the gun] was loaded" at the time. Counsel next pointed out that when Miller reenacted the incident for the jury, he hadn't "put [his] finger on the trigger." Miller insisted that he could not "say for sure in th[e] courtroom how [his] hand was that night," but counsel wouldn't let Miller off the hook so easily. Eventually, counsel's

questioning caused Miller to admit that his reenactment for the jury—finger "not on the trigger"—was "to the best of [his] recollection how it happened[.]"

The State then called a firearms expert, Kelly Fite. Fite testified that he conducted a "drop test" on Kendrick's rifle and "abuse[d]" it to see if that affected the force needed to pull the trigger. It did not. He also "checked the rifle for what's called a slam fire" and "attempt[ed] to accidentally discharge this weapon with the safety," but "[t]he only way [he could] get this rifle to fire was by pulling the trigger." Fite thus declared that in his expert opinion, "[t]he only way that you can fire [Kendrick's] rifle without breaking it is by pulling the trigger."

After cross-examining Fite and attempting to cast doubt on the validity of his conclusion, Kendrick's counsel recalled Miller to the stand. Counsel showed Miller the police incident reports from the night he was shot, in which Miller purportedly told other officers that the gun had gone off without his finger on the trigger. Miller, however, could not recall making those statements. Counsel next tried to impeach Miller with the reports, but the trial court sustained the State's objection. So, counsel called to the stand Officer Glen Sims, one of the authors of the incident reports. He sought to impeach Miller that way, but the trial court again sustained the State's objection.

The defense called the rest of its witnesses, and then Kendrick took the stand in his own defense. He testified that he "loved [his] wife and [he] would have never taken [their] children to [his] wife and done anything like that." He also maintained that they were not arguing outside the gas station and that he only carried a loaded rifle in the car for protection, as he and Lisa often cleaned houses in an unsafe part of town. According to Kendrick, Lisa had instructed him to "go ahead and put [the gun] in the trunk of the car." So he took it out of the front seat. When he reached into his pocket to retrieve his keys and moved the rifle to his right hand, "the gun went off" without him "pull[ing] the trigger." Lisa died almost instantly. Kendrick testified that he "just wanted to get the kids away" and that is why he "just got in the car and left." Because he was "scared," he threw the weapon out the window before calling 911 at the airport.

The jury was unconvinced by Kendrick's account. It found him guilty of first-degree murder, and Kendrick was sentenced to life in prison. The trial court denied Kendrick's motion

for a new trial, and on direct review, the Tennessee Court of Criminal Appeals affirmed his conviction. *See State v. Kendricks*, 947 S.W.2d 875, 878 (Tenn. Crim. App. 1996). The Tennessee Supreme Court declined to hear Kendrick's case. *See State v. Kendricks*, 1997 Tenn. LEXIS 248, at *1 (May 5, 1997) (order).

B.

Kendrick then petitioned for state postconviction relief. The postconviction trial court initially dismissed Kendrick's petition without a hearing, finding that the issues he raised had either been waived or previously determined. *Kendricks v. State*, 13 S.W.3d 401, 404 (Tenn. Crim. App. 1999). But the Tennessee Court of Criminal Appeals reversed in part and remanded the case for further proceedings. *See id.* at 405.

On remand, more than a dozen witnesses testified over the course of ten days of evidentiary hearings. Several of those witnesses are relevant to the two issues before us.

First, now-Sergeant Miller was asked again whether he recalled if his "fingers were anywhere near the trigger" when the rifle discharged and injured his foot. He responded, "No sir, I can't say with a hundred percent accuracy. They shouldn't have been." Miller then stated that he was put on pain medication shortly after the incident and didn't remember whether he had made any statements to fellow officers regarding the positioning of his fingers.

Three other police officers also testified regarding Miller's statements on the night of the shooting—Michael Holbrook, Glen Sims, and James Gann. Holbrook, who had prepared the initial report about Miller's injury after visiting him in the hospital, testified that Miller told him "his finger was not near the trigger" when the rifle fired. Sims next testified that he did not recall the circumstances surrounding the supplemental incident report he generated later that night. But he confirmed that the report stated that Miller told Officer Gann that the rifle "just went off." Gann, for his part, testified that he was the first officer to render assistance to Miller. He confirmed that after the accident, Miller "was in a lot of pain, bleeding and starting to go into shock." Yet when Gann was shown Sims's report, it did not "refresh [his] memory as to what [he] stated in regards to the incident[.]"

In addition to these four officers, Kendrick called Henry Jackson Belk Jr., a firearms expert from southern Idaho. Belk was the only expert called or identified during the postconviction hearings. He testified that Kendrick's Model 7400 rifle had "a common trigger mechanism" that "[g]enerally speaking," was contained within "all pumps and automatics manufactured after 1948 by Remington." According to Belk, Remington firearms with that particular design have "a history of firing under outside influences other than a manual pull of the trigger." This is because the buildup of debris in the trigger mechanism "can cause an insecure engagement between the hammer and the sear itself. So even with a gun on safe . . . it can still fire . . . [w]ithout pulling the trigger."

Belk stated that he "first identified the problem with the Remington Common Fire Control in 1970." And "[o]ver the years," he had been "consulted on probably two dozen cases" and had "given testimony in cases where the gun was subject to impact." The first case in which he examined the "Common Fire Control" as an expert was in 1994—a case he identified as "Keebler in Little Rock, Arkansas." That case was about a different firearm, a Remington 700, but Belk "did testify in the late nineties, probably '97 or '98, about a [Remington Model] 7400." Belk then surmised that "in '94, . . . if someone had done some research, they would have potentially been able to find [him.]"

Belk also "had occasion to look at" Kendrick's rifle prior to the hearing. He was unable to get the gun to fire without pulling the trigger. But Belk had an alternative theory as to what happened. He found that the rifle was dirty on the inside, "common to a gun that has not been cleaned." And while Belk did not find any debris in the trigger mechanism that could cause it to misfire, he explained that "transit debris" could have been "dislodged through mainly the recoil or even the operation of the gun." Even any "testing itself"—such as Fite's drop test—would tend to "destroy[] any evidence that was there." Belk therefore concluded that in his expert opinion, Kendrick's rifle "is capable of firing without a pull of the trigger, whether the safety is on or off." Belk's opinion thus contradicted Fite's conclusion at trial.

Finally, Kendrick called the public defender who had represented him during his November 1994 trial. Counsel testified that he did not personally interview Miller, but instead "relied on [his] investigator[]" to do so and "reviewed [Miller's] statements" to his colleague.

When he heard that Miller "said specifically that he was not holding the gun anywhere near the trigger housing and it discharged," counsel believed that "ought to prove our case." "And then beyond that, [counsel] was aware of [Miller's] previous statements that he didn't touch the trigger and the gun went off accidentally."

Counsel further asserted that he "thought Mr. Miller would testify consistently with what [counsel] knew to be his statements" before trial. He elaborated that having known Miller "in the past," he didn't think that Miller was "a dishonest person." So counsel "didn't think there would be any issue as to whether or not [Miller's] initial statements when he shot himself would come in." Because "there was not any doubt in [counsel's] mind" that Miller "was going to stick to his prior statements," he built his defense around that "gem." At one point, Kendrick asked if going into trial, counsel had a "backup plan" of "having other officers who made reports come in to testify[.]" Counsel responded that he did not "recall backup plans or specifically anything beyond that," explaining that he "presumed [he] would be able to get Mr. Miller's testimony that he was no[t] holding the trigger and the gun discharged." In counsel's view, he "could use that very effectively" to elicit an acquittal.

When Miller unexpectedly reversed course at trial, counsel felt "sandbagged by him." In fact, counsel expressed that he "was mad at [Miller]," because he "didn't think [Miller] was being fair" and he "thought [Miller] wasn't telling the truth" on the stand.

Counsel confirmed that later in the trial, he "recalled Mr. Miller with the purpose of trying to impeach him with prior inconsistent statements" contained in the incident reports. He acknowledged, however, that he didn't invoke the excited utterance exception to the hearsay rule as a basis for admission. Counsel then opined: "Well, in hindsight, I think it could . . . well have been used as an excited utterance." But after Miller's unexpected shift in story and "[i]n the heat of the trial, [counsel] didn't see that" at the time.

As to counsel's strategy for rebutting the State's expert, he testified that he "reviewed Mr. Fite's report" and the defense also "talked to [Fite] before the trial." From counsel's experience, he knew that Fite's "position is his position and he's not very easily swayed from that position." But even after reviewing the report, counsel believed that Miller's fortuitous shooting would

"trump[] anything Kelly Fite [could] say." He "thought that Mr. Miller shooting himself in the foot accidentally, without his hands near the trigger, was enough for a reasonable doubt as to anything." So counsel believed it was "a plausible and reasonable trial strategy" to have Kendrick testify "that the gun went off accidentally" and then to "buttress[]" that testimony with "the fact that it went off accidentally again and shot Mr. Miller." Counsel admitted that he did not seek an expert and could not recall whether he spoke with a local gunsmith he would often consult informally. And he agreed that "[i]n hindsight, especially with the knowledge now that there have been so many problems with the Remington trigger mechanism," it "would have been beneficial" to have an expert testify on Kendrick's behalf. But "at the time," counsel didn't recognize the potential significance of an expert; for despite his "fundamental knowledge of firearms," he "was not aware" of any "discussion in the industry about the trigger mechanism on the Remington being potentially able to malfunction." And, as counsel pointed out, "you couldn't Google Remington trigger mechanisms back then."

Following these hearings, the state trial court denied postconviction relief on each of Kendrick's claims. But the Court of Criminal Appeals reversed as to two of them. Specifically, it held that counsel was constitutionally deficient in his "failure to adduce expert proof about the Common Fire Control and his failure to adduce Sgt. Miller's excited utterances." *Kendrick v. State*, No. E2011-02367-CCA-R3-PC, 2013 WL 3306655, at *18 (Tenn. Crim. App. June 27, 2013). The court vacated Kendrick's conviction and declined to address the remaining issues. *See id.*

But the Tennessee Supreme Court reversed again. *See Kendrick v. State*, 454 S.W.3d 450, 481 (Tenn. 2015). In a lengthy opinion, the state's highest court unanimously concluded that neither of Kendrick's IAC claims had merit. First, it reasoned that "[t]his was not a case that hinged on expert testimony." *Id.* at 477. Kendrick's counsel "had a reasonable basis to believe Sergeant Miller would testify that he had not touched the trigger, and that this testimony would be 'enough for a reasonable doubt as to anything.'" *Id.* Moreover, "it remain[ed] entirely uncertain that Mr. Kendrick's trial counsel could have located and hired a firearm expert in 1994 who could have testified concerning the potential defects of the Remington Model 7400's trigger mechanism." *Id.* at 476. As such, the court rejected Kendrick's claim that it was ineffective

assistance for his counsel not to find and call a firearms expert. *Id.* at 477. Second, the Tennessee Supreme Court concluded that "trial counsel did almost everything at his disposal to prove that Sergeant Miller had not pulled the trigger, with the exception that he did not offer the statements as [excited utterances]." *Id.* at 480. The court thus disagreed that counsel had exhibited constitutionally deficient performance simply by "not attempting to use the excited utterance exception." *Id.* at 477, 481. In the alternative, the court held that Kendrick failed to show prejudice resulting from this second alleged error. *Id.* at 481.

Having rejected both IAC claims, the Tennessee Supreme Court remanded for further proceedings. *Id.* The U.S. Supreme Court declined to hear Kendrick's case. *See Kendrick v. Tennessee*, 577 U.S. 930 (2015). And finally, the Tennessee Court of Criminal Appeals rejected Kendrick's pretermitted claims. *See Kendrick v. State*, No. E2011-02367-CCA-R3-PC, 2015 WL 6755004, at *39 (Tenn. Crim. App. Nov. 5, 2015).

## C.

Out of options in state court, Kendrick filed a timely habeas petition in the Eastern District of Tennessee, alleging four dozen claims of constitutional error. The district court determined that the majority of Kendrick's claims were procedurally defaulted. *See Kendricks v. Phillips*, No. 1:16-CV-00350-JRG-SKL, 2019 WL 4757813, at *10–17 (E.D. Tenn. Sept. 30, 2019). It then denied the remaining eighteen claims on the merits. *See id.* at *18–34. We granted a COA for two of Kendrick's claims regarding: (1) counsel's failure to call a rebuttal weapons expert; and (2) counsel's failure to admit Miller's statements to other officers under the excited utterance exception to the hearsay rule.

One last note before we turn to the merits. Shortly before this court issued a COA, Kendrick was released on parole. But since Kendrick "was incarcerated at the time his petition was filed and is presently subject to parole supervision, the 'in-custody' requirement for relief in habeas remains satisfied and the issues presented by this appeal have not been mooted." *Goodell v. Williams*, 643 F.3d 490, 495 n.1 (6th Cir. 2011); *see Maleng v. Cook*, 490 U.S. 488, 491 (1989) (per curiam); *Abela v. Martin*, 380 F.3d 915, 921 (6th Cir. 2004).

II.

Because the Tennessee Supreme Court denied Kendrick's claims on the merits, he faces a "formidable barrier to federal habeas relief." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), we may not grant his habeas petition unless the state court's ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The phrase "'[c]learly established Federal law' . . . includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012)). "And an 'unreasonable application of' those holdings must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *Id.* (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)). This is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Tack on to that the "exacting *Strickland* standard," which governs the pair of IAC claims before us. *Ambrose v. Booker*, 801 F.3d 567, 579 (6th Cir. 2015); *see Strickland v. Washington*, 466 U.S. 668 (1984). "Under *Strickland*, we first determine whether counsel's representation 'fell below an objective standard of reasonableness.' Then we ask whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (internal citation omitted) (quoting *Strickland*, 466 U.S. at 688, 694). This too is a "most deferential" standard, "[e]ven under *de novo* review." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). *Strickland* commands us to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689. And it cautions that we must make "every effort" to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

Add it all up and we are left to apply a "doubly deferential" standard of review. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Indeed, because of the "general" nature of the *Strickland* inquiry and the broad range of factual circumstances that might give rise to IAC claims, we must afford a state court considerable "latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*; *accord Harrington*, 562 U.S. at 105 ("[T]he range of reasonable applications is substantial."). Kendrick cannot prevail unless he can show that the Tennessee Supreme Court's application of *Strickland* "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. That's a "high bar" to relief, which "is intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks and citation omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102.

## III.

Kendrick's appeal raises two IAC claims. First, he argues that counsel rendered ineffective assistance by failing to introduce Miller's hearsay statements—that the rifle discharged on its own—as excited utterances. Second, he contends that counsel was ineffective due to his failure to find and present a firearms expert to counter the State's own. Although we have our doubts about the viability of these two claims, our role as a federal habeas court under AEDPA is not to review them anew. And whether or not the Tennessee Supreme Court's unanimous rejection of these claims "was *correct*, it was clearly *not unreasonable*." *Renico v. Lett*, 559 U.S. 766, 779 (2010); *see Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (per curiam). We hold that at the very least, the Tennessee Supreme Court's opinion was not "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the U.S. Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013) (per curiam) (quoting *Harrington*, 562 U.S. at 102). Hence, AEDPA forecloses us from granting Kendrick's petition.

A.

We first address Kendrick's claim that his counsel was constitutionally deficient in failing to admit Miller's statements that he did not pull the trigger when he shot himself in the foot. Even assuming that the hearsay statements could have been introduced as excited utterances, *see* Tenn. R. Evid. 803(2),[1] "we cannot say that the state court's application of *Strickland*'s attorney-performance standard was objectively unreasonable," *Bell v. Cone*, 535 U.S. 685, 702 (2002). "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). And Kendrick's "[r]eliance on 'the harsh light of hindsight'" to second-guess his counsel's competence in the crucible of trial "is precisely what *Strickland* and AEDPA seek to prevent." *Harrington*, 562 U.S. at 107 (quoting *Bell*, 535 U.S. at 702).

Indeed, it is clear that "trial counsel took great pains to inform the jury that the weapon apparently misfired for Sergeant Miller." *Kendrick v. State*, 454 S.W.3d 450, 481 (Tenn. 2015). First, even Kendrick concedes that his counsel put on a thorough and "skilled cross-examination" challenging the credibility of Miller's unexpected lack of memory. Counsel elicited testimony from Miller that he had served as a police officer for twenty-two years and that he had never accidentally discharged a firearm in the past. He also got Miller to admit that it was "drilled into you at the police academy don't ever put your hand on the trigger unless you're going to shoot the gun." And, he prompted Miller to confess that he would never "knowingly" put his finger "on the trigger of a loaded gun." On recross, counsel likewise led Miller into testifying that he "presumed [the gun] was loaded" and "treated the gun that way" in picking it up. He next pointed out that when Miller reenacted the events before the jury, he held the gun with his "finger off the trigger." Finally, counsel closed his interrogation by boxing the waffling Miller into admitting that his reenactment—with his finger off the trigger—was "to the best of [his] recollection how it happened[.]" Through his effective questioning, then, counsel "elicited

---

[1]During postconviction review, the Criminal Court for Hamilton County and the Court of Criminal Appeals disagreed as to whether Miller's statements qualified as excited utterances. The Tennessee Supreme Court assumed without deciding that the statements would have qualified as excited utterances under Tennessee law. *See Kendrick*, 454 S.W.3d at 480.

answers strongly suggesting that Sergeant Miller would not have picked up the rifle with his finger on the trigger." *Id.* at 480.

And counsel didn't stop there. At the end of the prosecution's case-in-chief, counsel recalled Miller to the stand and attempted to refresh Miller's memory with the incident reports containing his hearsay statements. Miller, however, remained firm in his purported lack of memory.

So counsel tried a third route. He called one of the detectives who had produced one of the incident reports, seeking to introduce the report that way as impeachment evidence. *See* Tenn. R. Evid. 613(b). The trial court sustained the State's objection. But on direct review, the Tennessee Court of Criminal Appeals "found that the trial court erred by preventing Mr. Kendrick's trial counsel from impeaching Sergeant Miller based on his prior inconsistent statements." *Kendrick*, 454 S.W.3d at 480 n.19. That means that "counsel pursued a proper basis for the admission of the reports and failed only because of the *trial court's* error." *Id.* (emphasis added). That alone provides at least a "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. After all, "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Id.* at 111. And the appellate court only declined to reverse because, in its view, counsel's "thorough cross-examination of Officer Miller" rendered the trial court's error "harmless." *Kendricks*, 947 S.W.2d at 882.

In short, to prove that his counsel's zealous "[r]epresentation [was] constitutionally ineffective," Kendrick has to show that "it 'so undermined the proper functioning of the adversarial process' that [he] was denied a fair trial." *Harrington*, 562 U.S. at 110 (quoting *Strickland*, 466 U.S. at 686). Yet "counsel did almost everything at his disposal to prove that Sergeant Miller had not pulled the trigger, with the exception that he did not offer the statements as [excited utterances]." *Kendrick*, 454 S.W.3d at 480. So, Kendrick cannot show that the Tennessee Supreme Court "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell*, 535 U.S. at 699. AEDPA therefore bars relief.

In response, Kendrick does not dispute that after Miller's unexpected testimony, his "counsel labored to convince the jury that Sergeant Miller's finger was not on the trigger of the rifle when it fired into his foot." *Kendrick*, 454 S.W.3d at 480. Nor does he contend that, despite these repeated attempts, counsel's failure to identify the excited utterance exception "during the heat of the trial" was constitutionally deficient by itself. *Id.* Rather, he protests that his counsel personally should have "spoken with Inspector Miller to verify his testimony and to gauge his confidence in what had happened." Doing so, Kendrick surmises, "would have prompted counsel to form a backup plan—and anticipate a forgetful witness."

We are unpersuaded that Supreme Court precedent clearly establishes such a specific investigatory obligation in this case. To be sure, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. But the Sixth Amendment does not require an attorney to interview a witness personally when he reasonably believes that doing so is unnecessary. *See id.*; *cf. LaGrand v. Stewart*, 133 F.3d 1253, 1274 (9th Cir. 1998); *Lewis v. Mazurkiewicz*, 915 F.2d 106, 113–14 (3d Cir. 1990); *Beans v. Black*, 757 F.2d 933, 936 (8th Cir. 1985). Instead, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

Applying these principles, Kendrick is wrong that counsel's failure to interview Miller personally "can only be attributed to a professional error of constitutional magnitude." *Yarborough*, 540 U.S. at 9. This is readily apparent once we "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. For one, counsel did not simply neglect to investigate Miller, as Kendrick suggests. To the contrary, counsel "relied on [his] investigator[]" in the public defender's office to do so and then "reviewed [Miller's] statements" to his colleague. At the same time, "counsel reasonably believed that an investigation of what Miller's testimony would be was unnecessary," because "Miller had made statements to other officers to that effect." *Kendricks v. Parris*, No. 19-6226, slip op. at *7 (6th Cir. Mar. 31, 2020) (Readler, J.) (denying a COA on a similar IAC claim). Put those together and here's what counsel saw:

Miller's statements to the investigator aligned with those Miller had made to other officers the night of the incident, and having known Miller "in the past," counsel didn't have any reason to believe he was "a dishonest person." In these circumstances, counsel did what was arguably "reasonable at the time" and "balance[d] limited resources" in electing not to interview Miller personally. *Harrington*, 562 U.S. at 107; *see Jackson v. Warden, Chillicothe Corr. Inst.*, 622 F. App'x 457, 464 (6th Cir. 2015). That Miller later changed his story on the stand does not mean that counsel was constitutionally deficient.

Thus, in concluding that "counsel had a reasonable basis to believe Sergeant Miller would testify that he had not touched the trigger," *Kendrick*, 454 S.W.3d at 477, the state court's decision was not objectively unreasonable. Fairminded jurists could agree that Kendrick had not shown his attorney was deficient under *Strickland*.[2] Accordingly, the district court did not err in denying Kendrick's first IAC claim.

B.

We now turn to Kendrick's expert-witness claim. Kendrick is right that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (per curiam) (quoting *Harrington*, 562 U.S. at 106). "But *Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111. In this case, it was "well within the bounds of a reasonable judicial determination for the state court to conclude that defense counsel could follow a strategy that did not require the use of experts." *Id.* at 106–07.

1.

First, a fairminded jurist could agree with the Tennessee Supreme Court that counsel's pre-trial strategy for rebutting the State's firearms expert was reasonable. "Miller's injury was not speculative," *Kendrick*, 454 S.W.3d at 477, whereas any expert could only conjecture

---

[2]For this reason, we need not address the state court's alternative conclusion that the alleged deficiency was not prejudicial under *Strickland*. *See Shinn*, 141 S. Ct. at 524 ("[I]f a fairminded jurist could agree with either [the] deficiency or prejudice holding, the reasonableness of the other is 'beside the point.'" (quoting *Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per curiam))).

whether Kendrick's gun might have spontaneously discharged in the past. So "[t]he best evidence that Mr. Kendrick's Model 7400 was capable of misfiring" would have been "the undisputed fact that Sergeant Miller was shot in the foot by the very same rifle." *Id.* Counsel therefore strategically built his case around the Miller mishap—an "available" approach which did not "require[]" expert assistance. *Hinton*, 571 U.S. at 273 (quoting *Harrington*, 562 U.S. at 106).

This was not an uninformed decision. Counsel "reviewed Mr. Fite's report" and the defense also "talked to him before the trial." Even so, counsel believed that Miller's expected testimony would "trump[] anything Kelly Fite [could] say." As counsel explained, "Miller shooting himself in the foot accidentally, without his hands near the trigger, was enough for a reasonable doubt as to anything." And, as described above, counsel reasonably believed that Miller would "stick to his prior statements" at trial. "In hindsight, Sergeant Miller's testimony deviated from what trial counsel expected. But at the time defense counsel was forming his trial strategy, it was reasonable to anticipate that he could 'use [Sergeant Miller's testimony] very effectively' to elicit an acquittal." *Kendrick*, 454 S.W.3d at 477 (alteration in original) (quoting counsel's testimony). It is thus difficult for us to conclude that counsel's strategy was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. At a minimum, "[n]o precedent of [the Supreme] Court clearly forecloses that view." *Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016) (per curiam).

Second, even if counsel should have sought out an expert, a fairminded jurist could agree that it was "entirely uncertain" whether counsel would have found one in 1994 with a reasonable investigation. *Kendrick*, 454 S.W.3d at 476. Henry Belk is the only expert Kendrick has identified who might have been available to testify about the Remington trigger mechanism. Yet Belk offered his first testimony about the mechanism on a different Remington model at some unidentified point in 1994—the same year as Kendrick's trial. Belk did not testify about the Remington Model 7400 until several years later. And as counsel observed, "you couldn't Google Remington trigger mechanisms back then." Even if Belk's 1994 testimony preceded Kendrick's trial, Kendrick failed to present any evidence that counsel should have known that Belk might have been an available witness. To the contrary, despite counsel's "fundamental

knowledge of firearms," he "wasn't aware" of any "discussion in the industry about the trigger mechanism on the Remington being potentially able to malfunction."[3] "It was at least arguable that a reasonable attorney could decide to forgo inquiry" into a firearms expert in these circumstances. *Harrington*, 562 U.S. at 106.

2.

Kendrick offers four counterarguments, none of which persuade us. First, he maintains that, as in *Hinton v. Alabama*, the "only reasonable and available defense strategy" was to employ a defense expert. 571 U.S. at 273 (citation omitted). But as we have already explained, that is simply not true. It was arguably reasonable for counsel to build his case around Miller's testimony instead. Miller's unexpected change in his story "shows merely that the defense strategy did not work out as well as counsel had hoped, not that counsel was incompetent." *Harrington*, 562 U.S. at 109.

Moreover, the Tennessee Supreme Court reasonably found *Hinton* distinguishable. In that case, the defendant was charged with a pair of murders committed during the course of two robberies. 571 U.S. at 265. In order to convict Hinton of these murders, Alabama sought to link him to a third robbery "through eyewitness testimony and forensic evidence about the bullets" recovered from the scene. *Id.* The State's strategy was "then to persuade the jury that, in light of the similarity of the three crimes and forensic analysis of the bullets and the Hinton revolver, Hinton must also have committed the two murders." *Id.* Yet without any other evidence, "[t]he State's case turned on whether its expert witnesses could convince the jury that the six recovered bullets had indeed been fired from the Hinton revolver." *Id.*

---

[3]Kendrick cites two civil cases that would have revealed allegations of defective Remington firearms before 1994. *See Lewy v. Remington Arms Co.*, 836 F.2d 1104 (8th Cir. 1988); *Chapa v. Garcia*, 848 S.W.2d 667 (Tx. 1992). But neither case involved Belk or the Remington Model 7400. Neither mentioned experts that testified regarding a defective trigger mechanism. And neither involved circumstances of accidental discharge like those alleged here. The incident in *Lewy* occurred when the plaintiff "placed the safety on the fire position." 836 F.2d at 1105. And in *Chapa*, the "rifle discharged during loading." 848 S.W.2d at 667. Those cases therefore do not present clear and convincing evidence that counsel would have reasonably found Belk, or another expert, in 1994. While these cases do show that problems regarding other Remington firearms were not unknown at the time, counsel did attempt to cross-examine Fite about this.

Hinton's attorney filed a motion to hire an expert, and the trial court afforded him $1,000, which both the judge and Hinton's attorney believed was the statutory maximum. *Id.* at 266. The attorney later testified that the only expert he could hire for that amount "did not have the expertise he thought he needed and that he did not consider [the expert]'s testimony to be effective." *Id.* at 268 (citation omitted). Nevertheless, counsel "felt he was 'stuck'" with this inadequate expert who was later "badly discredited" at trial. *Id.* at 269, 273.

But that view was fundamentally mistaken. It turned out that $1,000 "was *not* the statutory maximum at the time of Hinton's trial," as the relevant Alabama statute had been amended to provide the defense with "'any expenses reasonably incurred'" in obtaining an expert. *Id.* at 267 (quoting Ala. Code § 15-12-21(d) (1984)). Thus, the Court held that counsel was deficient in his "failure to request additional funding in order to replace an expert he knew to be inadequate because he mistakenly believed that he had received all he could get under Alabama law." *Id.* at 274. *Hinton* was careful to explain, however, that "[t]he only inadequate assistance of counsel . . . was the inexcusable mistake of law—the unreasonable failure to understand the resources that state law made available to him—that caused counsel to employ an expert that *he himself* deemed inadequate." *Id.* at 275.

Here, by contrast, Kendrick has not identified any legal error that his counsel made in failing to obtain an expert. Nor has he shown that it was objectively unreasonable for Kendrick's counsel to put together his defense without one. *See Swaby v. New York*, 613 F. App'x 48, 50 (2d Cir. 2015) ("[T]he failure to seek an expert does not satisfy the performance prong of *Strickland* where counsel chooses a strategy that does not require an expert."). Nor does *Hinton* clearly establish that an attorney must hire an expert when, as here, he reasonably expects to be able to rebut the prosecution's expert effectively with a lay witness's testimony. *Cf. Hinton*, 571 U.S. at 273 (noting that "effectively rebutting [the State's] case *required* a competent expert on the defense side" (emphasis added)). Though we need not decide whether we would reach the same result *de novo*, we are satisfied that there is "ample room for reasonable disagreement" as to the need to hire an expert in this case. *Shinn*, 141 S. Ct. at 520. A fairminded jurist could agree with the Tennessee Supreme Court that "counsel made a reasonable tactical decision to construct his 'accidental firing' defense around Sergeant Miller's mishap with Mr. Kendrick's

rifle." *Kendrick*, 454 S.W.3d at 477; *see also Harrington*, 562 U.S. at 106 ("It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it.").

Kendrick next maintains that counsel had no reasonable strategy to counter Fite's testimony. But again, that's not true. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Harrington*, 562 U.S. at 111. And in this case, counsel both cross-examined Fite and sought to introduce Miller's statements in order to undermine Fite's opinion testimony. In cross-examining the State's expert, counsel first attempted to discredit Fite by characterizing him as someone who erroneously believed he never made mistakes. Then, he labored to have Fite concede that "there have been situations" where Fite had previously testified that a gun could not possibly discharge accidentally, but that, in fact, "guns of the same make and model" as those he described "did fire without pulling the trigger." Immediately after poking these small holes in Fite's testimony, counsel recalled Miller to the stand and presented him with the incident reports in an effort to show the jury that this particular gun had in fact misfired for Miller. That would have been a damaging blow to Fite's adamant testimony—that "[t]he *only* way you could fire this rifle [was] by pulling the trigger or breaking the gun."

Hence, counsel devised a reasonable approach to counteract Fite's testimony and to introduce proof suggesting that Kendrick's rifle could—and did—discharge on its own. Once we eliminate the distorting effects of hindsight, Kendrick cannot "overcome the presumption that, under the circumstances," his counsel's tactics "'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Kendrick also insists that the Tennessee Supreme Court erred in its factual determination that counsel could not "have located and hired a firearm expert in 1994" with a reasonably diligent investigation. *Kendrick*, 454 S.W.3d at 476. At the outset, we reiterate that "[a]n attorney can avoid" investigations "that appear 'distractive from more important duties.'" *Harrington*, 562 U.S. at 107 (quoting *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam)). And in light of Miller's anticipated testimony, it was reasonable for the state court to conclude

that counsel did not need to seek expert assistance at all. *See id.* at 106 ("*Strickland* . . . permits counsel to 'make a reasonable decision that makes particular investigations unnecessary.'" (citation omitted)).

But even if we believed that counsel was required to seek an expert, that would not justify our setting aside the Tennessee Supreme Court's decision. Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "And we apply the same deference 'even to state-court factual findings made on appeal.'" *Johnson v. Genovese*, 924 F.3d 929, 938 (6th Cir. 2019) (quoting *Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012)); *see Burt*, 571 U.S. at 22.

Kendrick has not met this demanding standard. To be sure, the record "does suggest that [counsel] could well have made a more thorough investigation than he did." *Burger v. Kemp*, 483 U.S. 776, 794 (1987). But the Sixth Amendment "does not force defense lawyers to scour the globe on the off chance something will turn up." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). We cannot say by clear and convincing evidence that, in 1994, counsel would have reasonably found Belk—a southern Idaho resident who first testified in the same year as Kendrick's trial about a different Remington model in one civil case in Little Rock, Arkansas. In fact, even if counsel could have reasonably tracked down Belk's out-of-state testimony in 1994, and even if counsel could have discovered that the two Remington models had the same trigger mechanism, nothing in the record clearly states that Belk had testified or even filed a publicly available expert report, about any type of firearm, *before* Kendrick's trial. *See Cullen*, 563 U.S. at 181 (holding that a habeas court's review "is limited to the record that was before the state court that adjudicated the claim on the merits"). Nor is there anything else in the record to suggest why Kendrick's counsel should have reasonably found this lone expert that Kendrick claims was so readily available.[4]

---

[4]Though we need not decide, we are also skeptical that Kendrick can show by clear and convincing evidence that he would have been permitted to hire an expert in 1994. *Cf. Kendrick*, 454 S.W.3d at 476. At the time, the state legislature had authorized funding for expert witnesses only in capital cases. *See* Tenn. Code Ann.

Finally, Kendrick turns to two of our prior cases addressing, under AEDPA, an attorney's failure to retain an arson expert. *See Stermer v. Warren*, 959 F.3d 704 (6th Cir. 2020); *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007). In *Stermer*, however, a divided panel granted habeas relief on other grounds and expressly declined to decide the merits of the IAC claim based on counsel's failure to retain an arson expert. *See* 959 F.3d at 738. So our discussion of counsel's duties with respect to rebutting expert testimony was dicta. *See Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019). In *Richey*, counsel affirmatively recognized the need for an expert and retained one, but counsel then unreasonably failed to consult the expert to help with the defense. 498 F.3d at 362. In this case, by contrast, a fairminded jurist could conclude that counsel had reasonably decided that no expert was necessary given Miller's anticipated testimony. Moreover, *Richey* predates the Supreme Court's guidance in *Harrington*, which held that a federal court misapplied AEDPA by finding that an IAC claim had merit under *de novo* review and then "declar[ing], without further explanation," that the state court's contrary ruling was unreasonable. 562 U.S. at 101–02. *Richey* engaged in that type of now-outdated review and barely referenced AEDPA's deferential standards when granting relief. *See* 498 F.3d at 361–64. "AEDPA demands more." *Harrington*, 562 U.S. at 102.

In sum, "the Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt*, 571 U.S. at 24. And that, Kendrick at least arguably received. "Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong," we conclude that the Tennessee Supreme Court's decision was "reasonable and supported by the record." *Id.* at 19, 24. As a result, Kendrick's second claim fails as well.

---

§ 40-14-207(b). And the most recent opinions of the Tennessee Supreme Court had held that "an indigent defendant does not have a right under the federal or state constitution, to the services of [an expert], at state expense." *Graham v. State*, 547 S.W.2d 531, 536 (Tenn. 1977); *accord State v. Williams*, 657 S.W.2d 405, 411 (Tenn. 1983). However, after these decisions, the U.S. Supreme Court held that an indigent defendant is constitutionally entitled to a psychiatric examination when his sanity at the time of the offense is seriously in question—at least in a capital case. *See Ake v. Oklahoma*, 470 U.S. 68, 70, 86–87 (1985); *id.* at 87 (Burger, C.J., concurring) ("Nothing in the Court's opinion reaches noncapital cases."). In the wake of *Ake*, multiple panels from the Tennessee Court of Criminal Appeals produced conflicting dicta as to whether *Ake* extended to noncapital cases like Kendrick's. *Compare State v. Harris*, 866 S.W.2d 583, 585 (Tenn. Crim. App. 1992), *and State v. Chapman*, 724 S.W.2d 378, 380 (Tenn. Crim. App. 1986), *with State v. Edwards*, 868 S.W.2d 682, 697–98 (Tenn. Crim. App. 1993). The law was thus unsettled at the time, and this is all the more reason to believe that counsel acted reasonably in building his case without expert assistance.

\* \* \*

We AFFIRM the district court's denial of Kendrick's habeas petition.