# SUPREME COURT OF THE UNITED STATES

## TONY MAYS, WARDEN *v.* ANTHONY DARRELL DUGARD HINES

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 20–507.   Decided March 29, 2021

PER CURIAM.

A Tennessee jury found Anthony Hines guilty of murdering Katherine Jenkins at a motel. Witnesses saw Hines fleeing in the victim's car and wearing a bloody shirt, and his family members heard him admit to stabbing *someone* at the motel. But almost 35 years later, the Sixth Circuit held that Hines was entitled to a new trial and sentence because his attorney should have tried harder to blame another man. In reaching its conclusion, the Sixth Circuit disregarded the overwhelming evidence of guilt that supported the contrary conclusion of a Tennessee court. This approach plainly violated Congress' prohibition on disturbing state-court judgments on federal habeas review absent an error that lies "'beyond any possibility for fairminded disagreement.'" *Shinn* v. *Kayer*, 592 U. S. ___, ___ (2020) (*per curiam*) (slip op., at 1); 28 U. S. C. §2254(d). We now reverse.

I

On March 1, 1985, Hines boarded a bus traveling from Raleigh, North Carolina, to Bowling Green, Kentucky. His girlfriend and her mother had given him the bus ticket and $20. Hines also carried with him a hunting knife concealed beneath his shirt. When the mother asked about the knife, Hines explained: "'I never go anywhere naked.'" "'I always have my blade.'" Record in *Hines* v. *Carpenter*, No. 3:05–cv–00002 (MD Tenn.), Doc. 173–4, p. 112.

Hines' travels brought him to the outskirts of Nashville,

where he checked into the CeBon Motel. Jenkins worked there as a maid. A few hours after Hines' arrival, the manager put Jenkins in charge of the motel and provided her with a bag of money to make change for departing guests.

In the early afternoon, another visitor found Jenkins' body in one of the rooms. She was wrapped in a bloody bedsheet, and an autopsy later revealed several knife wounds that included deep punctures to her chest and genitalia. Her money, wallet, and car keys were missing, as was her vehicle. Around the same time, another employee saw a man leaving the motel in Jenkins' car. The employee tried to follow the vehicle, but it sped away.

Later that afternoon, a group of travelers found Hines and the car—now broken down—along the side of the road, and they offered to drive him toward his sister's home in Bowling Green. During the trip, the travelers observed that Hines had dried blood on his shirt and was carrying a folded-up jacket. They also noticed that Hines "seemed real nervous," "ke[pt] contradicting himself," and "talked a lot," at one point claiming that he had purchased the car from an "old lady for $300 or $400." *Id.*, Doc. 173–2, at 33, 56; *id.*, Doc. 173–3, at 34–35.

Hines told a different story to his family. His sister noticed the blood, and Hines admitted that he had stabbed somebody at the motel—although he described the victim as a male employee who had assaulted him. For good measure, Hines physically demonstrated how he had knifed the supposed assailant. Despite his inability to pay for a bus ticket just a few days earlier, Hines purchased a barbecue grill and informed his sister that he had acquired a substantial sum of money. Family members also noticed that he had the keys to Jenkins' car, which were on a distinctive keychain. According to Hines, he had taken the keys in a struggle with yet another man who had tried to rob him.

Hines altered his tale again when he surrendered to law enforcement. Before the sheriff started questioning him,

Hines volunteered that "he took the automobile but he didn't murder the woman." *Id.*, at 54–55, 57. But Hines later changed his mind and offered to confess to the murder if the sheriff "could guarantee him the death penalty." *Id.*, Doc. 173–4, at 72.

The investigation turned up other physical evidence connecting Hines to the crime. Police found Jenkins' wallet where Hines had abandoned her car. And a search of his motel room revealed stab marks on the walls that were similar in size to the wounds on Jenkins' body. When an investigator asked Hines about the damage, he identified the holes as "'knife marks.'" *Id.*, at 83–84.

The jury heard all of this evidence at trial. It also heard testimony from the man—Kenneth Jones—who had discovered Jenkins' body. According to Jones, he knew the owners of the motel and had stopped by on the afternoon of the murder. Finding no one in the office, Jones had lingered outside before realizing that he needed to use the bathroom. He returned to the office, took a key, and entered the room. Hines' counsel stressed to the jury this oddly fortuitous sequence of events, noting that "Jones was fooling around at that motel that Sunday afternoon"; that Jones seemed "nervous"; and that Jones just happened to be present when "[t]here was a lot of something going on." *Id.*, Doc. 173–6, at 72–73. The jury also heard discrepancies between Jones' account of finding the body and the timeline given by first responders. But it found Hines guilty.

The full truth came out several years later when Hines sought postconviction review in the Tennessee courts. In a new statement, Jones admitted that he was at the motel neither by happenstance nor by himself, but rather in the company of a woman other than his wife. The duo had rendezvoused at the motel nearly every Sunday for at least two years, and Jones was well known to the staff. But when Jones and his companion arrived on the day of the murder, they found no one to greet them. After waiting for a while,

first at the motel and then at a nearby restaurant, Jones became impatient and helped himself to a room key from the office. Upon finding the body, he quickly returned to his vehicle—a fact confirmed by his companion who watched through the room's open curtains as Jones entered and left. Jones then called the authorities, drove his companion home, and returned to the motel to meet the sheriff.

The postconviction proceedings also revealed that Hines' attorney was generally aware of Jones' affair from the outset, yet had decided to spare him the embarrassment of aggressively pursuing the matter. *Hines* v. *State*, 2004 WL 1567120, *8 (Tenn. Crim. App., July 14, 2004). But despite Hines' current insistence that this choice amounted to ineffective assistance of counsel, the Tennessee postconviction court found no prejudice. *Id.*, at *22, *27–*28; see also *Strickland* v. *Washington*, 466 U. S. 668, 687 (1984) ("[T]he defendant must show that . . . counsel's errors were so serious as to deprive the defendant of a fair trial"). The court stressed "the strength of proof against [Hines]," and it dismissed as "'farfetched'" that trial counsel should have accused Jones of committing (and self-reporting) a grisly crime in a public place where he was "known by the staff." *Hines*, 2004 WL 1567120, *27. Such an argument, the court explained, "could have resulted in a loss of credibility for the defense." *Ibid.* The court also observed that the emergence of a new corroborating witness—Jones' companion—further undermined any suggestion that he was the culprit. *Id.*, at *28. And though Jones' evolving story deprived the jury of all the facts, the court reasoned that his "true purpose for being at the [m]otel" had little relevance to Hines' conviction or sentence. *Ibid.*

Sixteen years later, a divided panel of the Sixth Circuit disagreed. 814 Fed. Appx. 898 (2020). According to the majority, a better investigation "could have helped the defense to credibly cast Jones as an alternative suspect, or at the very least seriously undermine his testimony." *Id.*, at 938.

For example, trial counsel could have claimed that Jones killed Jenkins to cover up his affair. Counsel might also have highlighted that Jones was planning to rent a room from Jenkins on the day of the crime. *Id.*, at 938–939. Or counsel might have better stressed potential flaws in Jones' version of events, such as discrepancies about the exact time he reported the murder. *Id.*, at 940. The majority further surmised that Hines had "no clear motive" for the murder, and it noted the absence of "DNA or fingerprint evidence." *Id.*, at 939.

Missing from this analysis, however, was the voluminous evidence of Hines' guilt. Among many other things, the majority disregarded Hines' flight in a bloodstained shirt, his theft of the vehicle and money, and his ever-changing stories about stabbing and robbing various people on the day of the crime. See generally *id.*, at 937–942.

Judge Kethledge dissented. In his view, the majority "'nowhere g[ave] deference to the state courts, nowhere explain[ed] why their application of *Strickland* was unreasonable rather than merely (in the majority's view) incorrect, and nowhere explain[ed] why fairminded jurists could view [Hines'] claim only the same way the majority d[id].'" *Id.*, at 942. Judge Kethledge then reviewed all of the evidence ignored by the majority. He found "zero reason to think that, after investigation, counsel could have presented Jones as the 'real killer.'" *Id.*, at 944. And he explained that impeaching Jones "would have been a waste of time" because Jones had "offered no testimony regarding Hine[s'] guilt." *Ibid.*

## II

Hines' legal theory is straightforward: A competent attorney would have presented the full truth about Jones' affair and blamed him for the crime. According to Hines, this strategy would have deflected so much suspicion—or at

least so undermined Jones' credibility—that counsel's omission created a "'substantial'" risk of "a different result." *Cullen* v. *Pinholster*, 563 U. S. 170, 189 (2011). In fact, Hines reasons that, "had [he] not been found with Mrs. Jenkins' car, *Jones* would have been the primary suspect." Brief in Opposition 17 (emphasis added).

Our analysis is straightforward too. Because a Tennessee court considered and rejected Hines' theory, a federal court "shall not" grant a writ of habeas corpus unless the earlier decision took an "unreasonable" view of the facts or law. §2254(d). This "standard is difficult to meet." *Harrington* v. *Richter*, 562 U. S. 86, 102 (2011). The term "unreasonable" refers not to "ordinary error" or even to circumstances where the petitioner offers "a strong case for relief," but rather to "'extreme malfunctions in the state criminal justice syste[m].'" *Ibid.* In other words, a federal court may intrude on a State's "'sovereign power to punish offenders'" only when a decision "was so lacking in justification . . . beyond any possibility for fairminded disagreement." *Id.*, at 103.

If this rule means anything, it is that a federal court must carefully consider all the reasons and evidence supporting the state court's decision. After all, there is no way to hold that a decision was "lacking in justification" without identifying—let alone rebutting—all of the justifications. *Ibid.* Any other approach would allow a federal court to "'essentially evaluat[e] the merits *de novo*'" by omitting inconvenient details from its analysis. *Shinn*, 592 U. S., at ___–___ (slip op., at 8–9); see also *Richter*, 562 U. S., at 102–103.

The Sixth Circuit did precisely that. Nowhere in its 10-page discussion of Hines' theory did the majority consider the substantial evidence linking him to the crime: His flight in a bloody shirt; his possession of the victim's keys, wallet, and car; his recurring association with knives; or his ever-changing stories about tussling with imaginary assailants. 814 Fed. Appx., at 933–942. The court instead focused on

all the reasons why it thought Jones "could have" been a viable alternative suspect. *E.g.*, *id.*, at 938–942. And rather than engage with the "dissent['s] recount[ing of] th[e] evidence" against Hines, the majority simply promised that it had "carefully considered" this proof before summarily dismissing it as "not overwhelming." *Id.*, at 939.

Had the Sixth Circuit properly considered the entire record, it would have had little trouble deferring to the Tennessee court's conclusion that Hines suffered no prejudice regarding his conviction or sentence. Again, the critical question was not whether the Sixth Circuit *itself* could see a "'substantial' . . . likelihood of a different result" had Hines' attorney taken a different approach. *Cullen*, 563 U. S., at 189. All that mattered was whether the *Tennessee court*, notwithstanding its substantial "latitude to reasonably determine that a defendant has not [shown prejudice]," still managed to blunder so badly that every fairminded jurist would disagree. *Knowles* v. *Mirzayance*, 556 U. S. 111, 123 (2009).

It did not. The Tennessee court reasonably looked to the substantial evidence of Hines' guilt. *Hines*, 2004 WL 1567120, *27–*28. And it reasonably rejected the "'farfetched'" possibility that Jones committed and self-reported a gruesome murder, in the presence of a witness, at a place where he was well known to the staff. *Ibid.* In light of this straightforward, commonsense analysis, the Sixth Circuit had no license to hypothesize an alternative theory of the crime in which Jones became a suspect 35 years after the fact—much less rely on that fanciful theory to grant relief.*

———————

\*Even on its own terms, there is little merit to the Sixth Circuit's speculation that a jury who heard Jones' full story might have blamed him instead of Hines. After all, the story Jones told at trial was in many ways *more* suspicious than the truth. According to his initial account, Jones fortuitously stopped by the motel, hung around outside, and then stumbled upon the body. All without a witness to verify his actions. The jury

Similarly untenable was the Sixth Circuit's backstop theory that a more aggressive attorney could have changed the result by casting doubt on Jones' credibility. 814 Fed. Appx., at 940. As an initial matter, this conjecture ignores that Jones' brief testimony about discovering the body did not indicate that *Hines* was the culprit. Ample other evidence was what did that. Perhaps in light of this obvious disjuncture, the Sixth Circuit's analysis of why an attack on Jones' credibility would have been productive ultimately circled back to the majority's main assumption "that Jones was a viable alternative suspect." *Id.*, at 941. Regardless, to the extent Jones' credibility actually mattered, the jury already had several good reasons to be skeptical—for example, his peculiar tale of discovering the body; the insinuations of Hines' attorney; and the discrepancies between Jones' exact description of finding the body and the account of the first responders. None of these made a difference.

### III

The Sixth Circuit had no reason to revisit the decision of the Tennessee court, much less ignore the ample evidence supporting that court's conclusion. We grant the petition for a writ of certiorari and respondent's motion to proceed *in forma pauperis*, and we reverse the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE SOTOMAYOR dissents.

───────────

heard this tale—and Hines' attorney stressed its oddities—yet found that Hines was the murderer. A federal court cannot now claim that the truth would have made a difference.