NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0398n.06

No. 20-4222

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 24, 2021
DEBORAH S. HUNT, Clerk

MELISSA DOVALA,

    Petitioner-Appellee,

v.

TERI BALDAUF, Warden,

    Respondent-Appellant.

)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO

---

BEFORE: GRIFFIN, WHITE, and READLER, Circuit Judges.

GRIFFIN, Circuit Judge.

On the morning of February 6, 2004, Eileen Callahan-Smath dropped off her five-month-old son Riley at petitioner Melissa Dovala's home daycare. When picked up in the afternoon, Riley was "lifeless" and "blue," so Callahan-Smath rushed him to a nearby hospital. He died shortly upon arrival. The coroner determined the cause of Riley's death was blunt impact trauma to the head that occurred within just a few hours of death.

An Ohio jury convicted Dovala of felony murder, felonious assault, endangering children, and involuntary manslaughter, and she was sentenced to an indefinite prison term of fifteen years to life. She contends her trial counsel was ineffective because he elected not to pursue an expert who would have challenged the coroner's cause-of-death and time-of-injury conclusions. The Ohio Court of Appeals disagreed, reasoning her attorney's decision to aggressively cross-examine the prosecution's medical witnesses instead of engaging in a battle-of-the-experts defense fell

within the ambit of *Strickland v. Washington*'s deference to counsel's trial strategy. 466 U.S. 668, 687–91 (1984). Over a magistrate judge's recommendation to the contrary, the district court found this to be an unreasonable application of *Strickland* and granted a conditional writ of habeas corpus. We reverse.

## I.

The facts as recited by the Ohio Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1), which are as follows:

> Riley Smath was born on August 26, 2003. His mother, Eileen Callahan-Smath, originally planned to deliver Riley naturally, but doctors had to perform a cesarean section when she failed to progress after many hours of labor. After the cesarean, doctors examined Riley and declared him to be a healthy baby. The only problem Riley ever exhibited was his spitting up during and after feeding.
>
> Mrs. Callahan-Smath . . . arranged to bring Riley to [Dovala]'s house for day care beginning January 22, 2004.
>
> On February 6, 2004, Mrs. Callahan-Smath called [Dovala] after work to tell [Dovala] that she was running late to pick up Riley. [Dovala] informed her that something was wrong with Riley, that she could not wake him, and that he needed to go to the emergency room. After Mrs. Callahan-Smath arrived at [Dovala]'s home [around 5:00 p.m., he looked lifeless and appeared blue; so] she rushed Riley to the hospital. Riley was pronounced dead shortly thereafter, and doctors later determined his death to be the result of blunt impact trauma to the head [and that the time between the injury and death was three to five hours].
>
> After Riley's death, Detective Dan Jasinski interviewed [Dovala] at her home and recorded the interview on videotape. [Dovala] answered questions about her day with Riley, but denied that either she or one of the day care children hurt Riley in any way.

*State v. Dovala*, 2007 WL 2752395, at *1 (Ohio Ct. App. Sept. 24, 2007); *see also State v. Dovala*, 2009 WL 806847, at *1 (Ohio Ct. App. Mar. 30, 2009). After unsuccessfully appealing her convictions, Dovala sought collateral relief in the Ohio state courts. Two opinions from the Ohio Court of Appeals are relevant, *Dovala III* and *Dovala V*. We discuss each in turn.

A.

*Dovala III* adjudicated on the merits petitioner's claim that her trial counsel, James Burge, provided ineffective assistance. *State v. Dovala*, 2011 WL 2533915 (Ohio Ct. App. June 27, 2011) (*Dovala III*). That opinion sets forth extensive facts and reasoning that are at the heart of this case.

1.

The Ohio Court of Appeals initially resolved Dovala's objections to the trial court's findings of fact. Two are of import here.

First, the Ohio Court of Appeals addressed the trial court's finding that Burge "consulted with a neurologist throughout the case":

> [Dovala] argues that the "consultation" attested to by Burge was nothing more than an informal discussion between Burge and his co-counsel's husband, Dr. Tom Watson, a neurologist. [Dovala] argues that it is misleading and inaccurate to consider Burge's discussion with Dr. Watson a "consultation" because Dr. Watson was not compensated for his services and did not provide a written report of his findings. Given the lack of a report, [Dovala] asserts that it is unclear what materials he reviewed and relied on in arriving at his conclusion that Smath's death was the result of an inflicted injury that would have been accompanied by the quick onset of symptoms. [Dovala] also asserts that the informal nature of the "consultation" with Dr. Watson resulted in several questions critical to her defense being left unanswered, specifically, whether the injuries to Smath could have been inflicted by a younger child at an earlier point in the day. Dovala considers this possibility one of "huge importance" because there was testimony at trial that Smath had started crying earlier in the day while Dovala was out of the room, but her four year old son remained in the room with him. Dovala further argues that the neurological consultation should have included an assessment of the inconsistencies between the severe internal tissue and skull damage and the lack of any external bruising or lacerations.
>
> In his deposition testimony, Burge testified that he has practiced criminal law for thirty years. Throughout that time, he has defended four infant homicides before representing Dovala, taking three of those cases to trial. Based on his experience, he understood that the trauma to the head generally occurred close in time to the infant's death. Further, at the point he was retained by Dovala, she had made several statements to the police, one of which was video recorded and admitted into evidence at trial. In those statements and in her testimony at trial, Dovala stated that it was "absolutely not" possible that one of the other children could have done

anything to Smath that day, and further, that there were no accidents or other adults present in the house that could have caused his injuries. Burge explained that these statements made it very difficult to mount a defense that another party had caused the fatal injuries to Smath. He did, however, discuss the case with Dr. Francis Bartek, a physician specializing in obstetrics and gynecology ("OB/GYN") who had testified in the past for one of Burge's clients, and Dr. Tom Watson, a neurologist, who was also the spouse of Burge's co-counsel. Though neither physician prepared a report on the case, Dr. Bartek, who was compensated $2,000 in December 2004 for his analysis, suggested there might be a congenital weakness in the skull and reviewed Smath's medical records from birth. Dr. Bartek gave Burge the name of two other physicians who could conduct genetic testing to determine if there was such a weakness in Smath's skull, one of whom was Dr. Brian Clark. Burge testified that Dr. Clark was able and willing to perform the testing on Smath's parents and that the Smaths had agreed to submit DNA samples for testing. Burge discussed this strategy with Dovala and informed her of the ramifications of the test results on her defense, particularly if the test demonstrated that there was not any congenital weakness. Burge stated he left the decision up to Dovala, and that she instructed him not to pursue the testing. We note that Dovala disputes Burge's testimony, testifying in her deposition that she left the decision up to Burge and was under the impression that the testing had been done, until she learned just weeks before her trial that it had not, in fact, been done.

According to Burge, Dr. Watson, who was not compensated for his assessment of the case, reviewed both the medical records and the autopsy report and concluded that Smath's trauma was the result of an "inflicted injury" and that "the onset of symptoms from the injury would have occurred very quickly." Dr. Watson further indicated to Burge that "whoever inflicted it knew they did it." Burge stated that he consulted with Dr. Watson approximately three months before the matter was set for trial and that Dr. Watson attended portions of the trial as well. Burge admitted that he did not pursue further questioning with Dr. Watson as to the discrepancies between the internal and external damage to Smath's skull, in part because of Dr. Watson's assessment, but also based on Burge's own experience and research with the nature of the head injuries in these cases. For these reasons, he considered it "unrealistic" to consult with another physician in an attempt to develop an alternative cause of death. Based on the foregoing, we conclude that there was some competent, credible evidence to support the trial court's conclusion that Burge consulted with two different physicians throughout Dovala's case.

*Id.* at *3–4.

Second, it considered one aspect of the testimony of petitioner's post-conviction medical expert, Dr. Audrius Plioplys, which was critical of the blunt-force-trauma conclusion drawn by the prosecution's experts:

Next, we consider Dovala's challenge to the trial court's finding that Dr. Audrius Plioplys was unable to provide "a precise opinion on the amount of compressive force needed to cause the fractures" to Smath's skull. Dr. Plioplys testified at the post-conviction hearing that Smath's injuries were the result of "compressive-based force," not blunt trauma, as was the opinion of the State's experts at trial. In addressing the amount of force necessary to inflict a compressive force injury, Dr. Plioplys' testimony ranged from a statement that the injury could have resulted from "some pressure" from a thumb or a knuckle being applied for a brief period of time, to a later statement that, although the force "could have been very brief, it was considerable force." Though he opined in his affidavit and at the hearing as well that the force could have been inflicted "by the normal physical strength and body weight of a child four years of age or older," he was unable to specify the amount of weight or calculation of force that was necessary to inflict the fatal fracture. His only testimony in this regard was that a finger or knuckle placed on the developing skull of a person Smath's age could have produced such an injury "with just enough weight being placed on it." When explicitly asked if he could determine the amount of weight or force necessary to cause the type of fracture suffered by Smath, however, Dr. Plioplys stated he could not. He further agreed that he was not familiar with the literature or field of research on the amounts of pressure necessary to cause certain types of fractures. Based on this testimony, we conclude that there was some competent, credible evidence adduced at the hearing to support the trial court's finding as to Dr. Plioplys' opinion on the amount of force necessary to cause Smath's injuries.

*Id.* at *4 (alterations omitted).

2.

After resolving these factual disputes, the Ohio Court of Appeals then rejected Dovala's claim "that Burge was ineffective because he failed to investigate her case and prepare an adequate defense," *id.* at *5, focusing both on Burge's testimony as to why he pursued aggressive cross-examination over a battle of the experts and the deference we give to counsel's strategic decisions:

At his deposition, Burge stated that he was limited in his options for asserting a defense in light of Dovala's numerous statements to police that no other adults or children had been near Smath that day, nor had there been any accidents in the home. Burge reasoned that it would be inconsistent at trial to blame another person in the house that day for the injuries based on Dovala's statements. Additionally, Burge testified that the coroner's estimate that the injury had occurred between three to five hours before Smath's death, coupled with his own experience in similar cases, precluded any attempt to suggest that another party, such as Smath's parents, had caused the injury. Burge explained that based on his experience in similar

cases, his discussions with Dr. Bartek and Dr. Watson, and the statements Dovala made to police before retaining him as counsel, he felt the best strategy to pursue in Dovala's defense would be to rely on a vigorous cross-examination of Dr. Daniels and Dr. Matus. The record reflects Burge did so, offering several medical journals and studies challenging the conclusion of Dr. Matus, so much so that Dr. Matus agreed there was a possibility, though remote, that there were factors that could lead to increased intracranial pressure and result in a fracture similar to the one suffered by Smath.

Consistent with the Supreme Court's directive, this Court has rejected the assertion that trial counsel is ineffective if he elects not to put forth an expert on defendant's behalf, and instead, relies on a rigorous cross-examination of the State's witnesses. Here, the record reflects Burge's deliberate decision, based on a variety of considerations including discussions with medical professionals, not to seek an expert on Dovala's behalf, but to instead attack the credibility and findings of the State's experts. Giving due deference to counsel's decision, we cannot conclude that the failure to obtain an expert under these circumstances constitutes ineffective assistance of counsel. Moreover, "decisions regarding the calling of witnesses are within the purview of defense counsel's trial tactics." In that same regard, we agree with other courts that have held that a post-conviction relief petitioner cannot demonstrate ineffective assistance of counsel by presenting "a new expert opinion that is different from the theory used at trial." "Ohio case law clearly shows that alternate or supplementary theories from expert witnesses, which are presented in post-conviction proceedings, are not sufficient to establish ineffective assistance of counsel." Despite Devan's claims that Burge's cross-examination was not effective, the record reveals that Dr. Matus agreed that it was possible that increased cranial pressure could have caused an existing fracture to expand in size, resulting in a fracture similar to the one that occurred here.

To the extent Dovala takes issue with Burge's failure to properly investigate her claims, Burge testified that he sought the expertise of both an OB/GYN and a neurologist as well as conducting supplemental research on alternative causes of infant death in such circumstances. Further, Burge's initial and supplemental requests for discovery provide evidence that he pursued relevant information necessary to prepare a defense in this case. This Court will not employ "hindsight to distort the assessment of what was reasonable in light of counsel's perspective at the time." Therefore, the trial court did not abuse its discretion in denying Dovala's petition for post-conviction relief because there was no evidence that Burge was deficient in performing his duties as counsel. Having concluded that Burge was not deficient in acting as counsel, we need not address whether she suffered any prejudice.

*Id.* at *7–8 (alterations and internal citations omitted).

B.

Petitioner later moved for relief from judgment after learning "that the neurologist Burge

testified to consulting was Dr. Swanson, not a Dr. Tom Watson" and that "Dr. Swanson . . . never

discussed Dovala's case with Burge and never rendered a medical opinion." *State v. Dovala*, 2014

WL 2522022, at *1 (Ohio Ct. App. June 2, 2014). In response, Burge admitted "that he did not

formally consult with Dr. Swanson, but that Dr. Swanson did provide an unofficial opinion to his

co-counsel, Laura Perkovic, who was at that time married to Dr. Swanson." *Id.* The trial court

denied petitioner's motion, which leads us to the last state-court appeal.

In *Dovala V*, the Ohio Court of Appeals again detailed Burge's strategy and provided some

more facts relevant to his consultation with Dr. Swanson:

> In support of her petition, Dovala presented the testimony of Dr. Audrius Plioplys,
> a retired pediatric neurologist who opined that the victim's injuries were not caused
> by blunt force trauma, but by compressive force applied directly to a single point
> on the skull. In his affidavit and testimony in support of the petition, Dr. Plioplys
> also disagreed with the State's trial experts regarding the timeframe during which
> the victim's injuries could have occurred. Specifically, he concluded that he could
> not narrow the timeframe further than the twenty-four hour window before the
> victim's death.
>
> The videotaped deposition of Attorney Burge was admitted into evidence during
> the hearing on Dovala's petition. Attorney Burge explained that according to his
> understanding of the timeline and potential testimony by the State's experts, the
> onset of the victim's symptoms happened too late in the day to attribute them to an
> injury that occurred before he was in Dovala's care. He also explained that Dovala
> had taken the position, as memorialized in a recorded interview with police, that no
> one else in her home had injured the victim. In response to questions about whether
> another child in the home could have injured the victim—the theory espoused by
> Dr. Plioplys—Attorney Burge reasoned that although the argument could be made
> despite Dovala's own prior statements, it was not a defense that would have proved
> successful. Attorney Burge testified that he believed that the only avenue open to
> him in light of the substantial limitations imposed by Dovala's prior statements was
> a defense that the injury was a preexisting or congenital condition.
>
> Attorney Burge then described how this defense unfolded. He testified that he
> consulted Dr. Thomas Swanson, whose name he recalled incorrectly at the time,

between 60–90 days before trial. Attorney Burge acknowledged that Dr. Swanson was married to his co-counsel at that time, which provided him the opportunity to review records. Attorney Burge stated that the case was one of interest to Dr. Swanson, and that he was not paid a fee. According to Attorney Burge, he did not pursue a formal consultation with Dr. Swanson because he believed him unlikely to opine that the victim suffered anything other than an inflicted injury. Attorney Mark Devan, an expert who testified regarding Attorney Burge's performance during the hearing on Dovala's petition, agreed that Attorney Burge's interaction with Dr. Swanson could be characterized as an "unpaid, informal consult" by the "ex-husband of co-counsel."

Dovala's motion for relief from the trial court's judgment denying postconviction relief was based on an affidavit obtained from Dr. Swanson. In that affidavit, Dr. Swanson affirmed that he was married to Attorney Burge's co-counsel at the time of Dovala's trial and that he discussed the case with her "in a casual manner at our home." He denied that he discussed the case directly with Attorney Burge, and stated that he did not "officially opine anything regarding the mechanism of the death" involved in this case. He also recalled that he "did not have access to or review the records in any detail that would have allowed a learned opinion in this case." Attorney Burge provided an affidavit in response to Dovala's motion. In that affidavit, he clarified that any consultations with Dr. Swanson were informally conducted through co-counsel, to whom Dr. Swanson was married at the time. Attorney Burge adhered to his recollection that Dr. Swanson believed that the injury involved in this case was inflicted, and Attorney Burge reiterated that because the theory of Dovala's defense had already been developed at that time, he did not believe that a formal consultation with Dr. Swanson would have been helpful.

While Dovala's motion was pending, counsel deposed trial co-counsel, Attorney Laura Perkovic. Attorney Perkovic's recollection of details surrounding the defense was hampered by the passage of time. Although she disagreed with parts of Attorney Burge's affidavit, she also disagreed with elements of Dr. Swanson's affidavit. The substance of her testimony, however, confirmed that Attorney Burge did ask her to speak to Dr. Swanson about Dovala's case, and that she did so, providing access at least to the autopsy photographs and report. According to Perkovic, Dr. Swanson would not provide an opinion without being formally retained, but that he did tell her that because the case involved "brain trauma," he would be qualified to formally consult on the case.

*State v. Dovala*, 2016 WL 1295954, at \*2–3 (Ohio Ct. App. Mar. 31, 2016) (*Dovala V*) (emphasis

omitted). And it then summarily concluded Dovala was not entitled to relief from judgment:

Although the witnesses' recollections of the details differ in light of the passage of time, a witness during the postconviction proceedings summarized Attorney Burge's consultation with Dr. Swanson in a manner consistent with the new

testimony: it was informal, Dr. Swanson was not retained, and it occurred because Dr. Swanson was married to co-counsel. This much was clear as a result of Attorney Burge's deposition during the postconviction proceedings, and it was not an abuse of discretion for the trial court to conclude that the information set forth in Dr. Swanson's affidavit did not undermine the accuracy and credibility of the judgment.

*Id.* at \*4.

## C.

Having exhausted all available state-court remedial options, Dovala filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, raising again (and only) her ineffective-assistance-of-counsel claim. The district court rejected a magistrate judge's report and recommendation and instead granted a conditional writ that required the State of Ohio to release Dovala unless it scheduled a new trial within 120 days. It initially stayed that order pending appeal, which the State timely commenced. However, following briefing completion here and our scheduling of oral argument for June 2021, the district court, on April 29, 2021, vacated the stay, ordered that petitioner be released on bond, and began the 120-day clock anew. We promptly stayed both the district court's order granting Dovala's release and its order conditionally granting Dovala's habeas petition pending our resolution of the appeal.

## II.

Placed in petitioner's path to relief are several imposing hurdles.

First, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). Accordingly, "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (internal

-9-

quotation marks omitted). AEDPA provides that federal courts can overturn a state conviction for an issue adjudicated on the merits, like Dovala's claim here, only if the relevant state-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This is a "formidable barrier," *Burt*, 571 U.S. at 19; "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103. Being wrong or even clearly erroneous "will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (citation omitted). "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted).

Second, a prisoner asserting an ineffective-assistance-of-counsel claim must demonstrate both deficient performance and prejudice. *Strickland*, 466 U.S. at 687. The first component requires a showing that the lawyer's performance "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Id.* at 687–88. Given the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," the Supreme Court has cautioned that "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one," *Harrington*, 562 U.S. at 105, and "a court still may not grant relief if the record does not reveal that counsel took an approach that no competent lawyer would have chosen" even in cases where "there is reason to think that counsel's conduct was far from exemplary," *Dunn v. Reeves*, 141 S. Ct. 2405,

2410 (2021) (per curiam) (brackets and internal quotation marks omitted). And upon a prisoner's satisfaction of a deficient-performance showing, he must also establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

The combined effect of these two "highly deferential" legal prisms means that we must defer to the state court's adjudication of an ineffective-assistance-of-counsel claim "doubly so." *Id.* at 105 (internal quotation marks omitted). Accordingly, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* With this overlay, *Harrington* instructs that we "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Id.* This necessarily means that under double-deference review, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. So, as the Supreme Court reminded us earlier this year, "the critical question [i]s not whether the Sixth Circuit *itself* c[an] see [a *Strickland* violation.] All that matter[s i]s whether the *[state] court*, notwithstanding its substantial latitude to reasonably determine that a defendant has not shown [a *Strickland* violation], still managed to blunder so badly that every fairminded jurist would disagree." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per curiam) (alterations and internal quotation marks omitted).

### III.

Dovala must first establish that the Ohio Court of Appeals unreasonably concluded Burge did not provide ineffective assistance when he elected an aggressive cross-examination strategy over pursuing experts of his own as part of Dovala's defense. We review de novo the district

court's legal conclusion that Dovala overcame double-deference review. *See, e.g.*, *Johnson v. Genovese*, 924 F.3d 929, 933 (6th Cir. 2019). *Harrington* compels us to disagree with the district court.

A.

*Strickland*'s performance-standard "rule is as general as they come." *Davis v. Carpenter*, 798 F.3d 468, 473 (6th Cir. 2015). A lawyer provides constitutionally adequate representation when his efforts fall "within 'the wide range of reasonable professional assistance.'" *Id.* (quoting *Strickland*, 466 U.S. at 689). With respect to an attorney's decision not to investigate, that choice "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments"; moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.

The Supreme Court has not had the occasion to examine a case with similar contours to Dovala's. No case has set a floor for the steps an attorney must take when determining whether to employ a battle-of-the-experts defense, let alone whether those steps must constitute formal engagement (as Dovala suggests) over informal and limited fact-gathering (as Burge did). *Cf. Davis*, 798 F.3d at 473–74. But what the Supreme Court has instructed—doing so about five months before the Ohio Court of Appeals adjudicated Burge's performance in *Dovala III*—is that *Strickland* does not require a defense attorney to present an expert whenever a prosecutor does so. *Harrington*, 562 U.S. at 111 ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense."). Furthermore, the Court endorsed the very strategy Burge utilized as an alternative to expert-testimony: cross-examination, "the greatest legal engine ever invented for the discovery of

truth." *California v. Green*, 399 U.S. 149, 158 (1970) (internal quotation marks omitted). "In many instances," the *Harrington* Court noted, "cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict." 562 U.S. at 111. These directives, the generality of *Strickland*'s minimum-performance standard, and AEDPA deference, mean we owe the Ohio Court of Appeals considerable latitude. *See Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). In our view and consistent with the magistrate judge's opinion, *Dovala v. Tim*, 2019 WL 10890248, at *17–21 (N.D. Ohio Oct. 30, 2019), we cannot find that "*every* 'fairminded juris[t]' would agree that *every* reasonable lawyer would have made a different decision," *Dunn*, 141 S. Ct. at 2411 (quoting *Harrington*, 562 U.S. at 101), particularly given significant factual developments that limited Burge's options.

Begin with the restrictions placed on Burge by Dovala's statements to law enforcement made shortly after Riley's death. She told police that there were no accidents at the house involving Riley and disclaimed any possibility that another child (or anyone else) inflicted the injury on him. Those admissions limited Burge's options for undermining the prosecution's charge that the injury occurred while in her care—e.g., that someone else in her home was responsible, by accident or purpose.

Consider too what Burge learned from his consultations with medical professionals about the case. One (Dr. Bartek) told him of the possibility that Riley's skull was congenitally weak, and that it would be possible to use his parents' DNA profile to account for that possibility. Burge testified that he raised this possible line of defense with Dovala, but that she worried what his

strategy would be if the test showed no congenital abnormalities.[1]  And he elicited informal advice from a neurologist (Dr. Swanson) who Burge believed gave him no reason to consider challenging the coroner's conclusions regarding the cause or timing of death.

Finally, considering what was already known about the case, there was little to put Burge on notice that a further investigation and formal consultation with an expert witness might be fruitful to Dovala.  *See Strickland*, 466 U.S. at 691; *see also Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); *Caudill v. Conover*, 881 F.3d 454, 463 (6th Cir. 2018) (noting the difference between "a complete failure to investigate" and "failing to dig deeper" (internal quotation marks omitted)).  No information before Burge, other than Dovala's telling of the events, indicated that there was reason to be skeptical of the coroner's causation or timing conclusions.  So although Burge's decision to pursue cross-examination rather than calling an expert witness may have constituted less than exemplary lawyering, it cannot be said that he had no possible reason for his decision.  *See Pinholster*, 563 U.S. at 196.  As the Supreme Court recently explained in *Dunn v. Reeves*, a state court is "entitled to reject [a defendant's] claim if trial counsel had any 'possible reason for proceeding as they did.'"  141 S. Ct. at 2412 (quoting *Pinholster*, 563 U.S. at 196 (alterations omitted)).  Because Burge did not have a particularly "solid case" to defend, we cannot find that "*every* 'fairminded juris[t]' would agree that *every* reasonable lawyer would have made a different decision."  *Id.* at 2411 (quoting

---

[1]Dovala disagrees with Burge's testimony here, *Dovala III*, 2011 WL 2533915, at *3, but she does not anchor any part of her ineffective-assistance claim in this aspect of Burge's representation.  Indeed, it was perhaps good trial strategy not to pursue a skull test because it could have done more harm than good if Dovala's worry came to fruition.

*Harrington*, 562 U.S. at 101).  Thus, established Supreme Court precedent precludes habeas relief in this case.[2]

B.

The district court saw this case differently.  It faulted Burge for both not consulting a doctor on the timing of Riley's injuries and for his "blanket acceptance of Dr. Swanson's alleged opinion regarding the cause of Riley's injuries."  However fair that criticism may be, the district court's decision to grant habeas relief reflects one that viewed Dovala's claim through *Strickland*'s familiar standard without adding *Harrington*'s constraining lens.  Under that controlling precedent, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington*, 562 U.S. at 105.  True, the district court cited and briefly discussed *Harrington*.  It did not, however, apply the question *Harrington* decrees, let alone the Court's on-point language about pursuing cross-examination over expert witnesses, especially "[w]hen defense counsel does not have a solid case" as examined above.  *Id.* at 111.  Admittedly, our decision is guided in part by the Supreme Court's recent application of the *Harrington* standard in *Dunn*, which provided helpful analysis regarding the limited instances in which federal courts may grant habeas relief on ineffective assistance of counsel claims—guidance that was not available at the time of the district court's decision in this case.  Regardless, the *Harrington* standard as elaborated in *Dunn*, precludes the relief granted by the district court.

---

[2]Because fairminded jurists could debate the Ohio Court of Appeals' holding that Burge's performance did not fall below constitutionally permissible levels, we need not address the district court's separate holding that Dovala established a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

Finally, we are not persuaded that any of the authority relied upon by the district court and petitioner mandate a different outcome. *Richey v. Bradshaw* is the chief one. 498 F.3d 344 (6th Cir. 2007). There we similarly considered an attorney's decision to pursue cross-examination instead of hiring an expert to testify on his client's behalf, and concluded the attorney performed deficiently because he did not make a determination as to why the consulted expert (who agreed with the findings of the state's experts and thus would not have provided helpful testimony) reasoned as he did before declining to pursue a battle-of-the-experts defense. *Id.* at 362–63. Given the factual similarities, we can see the allure of that case. But we have subsequently characterized *Richey* as a decision that applied an "outdated," pre-*Harrington*-style-of-review that "barely referenced AEDPA's deferential standards when granting relief." *Kendrick v. Parris*, 989 F.3d 459, 476 (6th Cir. 2021).[3]

## IV.

For these reasons, we reverse the judgment of the district court.

---

[3]Dovala's other main cases similarly miss the mark. *Stermer v. Warren*, 959 F.3d 704 (6th Cir. 2020), also dealt with the failure to retain an expert. But, as *Kendrick* sets forth, "our discussion of counsel's duties with respect to rebutting expert testimony was dicta" because the *Stermer* panel "expressly declined to decide the merits of the IAC claim based on counsel's failure to retain an arson expert." 989 F.3d at 476 (discussing *Stermer*, 959 F.3d at 738). *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), and *Wiggins*, 539 U.S at 527, are also distinguishable— they too are pre-*Harrington* cases and involved counsel, who unlike Burge, had known evidence at their ready that would have caused a reasonable attorney to investigate further.